**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      No. CR 20-1627 JB

ANTONIO QUINTANA-PENA,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence Based on Constitutional Violations, filed March 22, 2024 (Doc. 84)("MTS").  The Court held an evidentiary hearing on April 23, 2024.  <u>See</u> Clerk's Minutes, filed April 23, 2024 (Doc. 94).  The primary issues are: (i) whether the Court should suppress evidence found in the vehicle in which law enforcement officers discovered Defendant Antonio Quintana-Pena, because the vehicle search violated the Fourth Amendment to the Constitution of the United States; and (ii) whether the Court should exclude all statements elicited and evidence obtained as a result of law enforcement's questioning of Quintana-Pena, because Quintana-Pena was interrogated in a custodial setting without first being advised of his rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)("<u>Miranda</u>"), in violation of the Fifth Amendment to the Constitution of the United States.  The Court concludes that: (i) the evidence discovered in Quintana-Pena's vehicle is admissible, because the warrantless search of the vehicle was justified by the automobile exception and as a search incident to arrest; and (ii) the Court will suppress the statements Quintana-Pena made, because Quintana-Pena was interrogated in custody, but the Court will not suppress any of the lawfully obtained evidence discovered in Quintana-Pena's vehicle on the basis of the <u>Miranda</u>

violation, because there is no causal link between the violation and the discovery of the contraband, the doctrine of inevitable discovery applies, and Quintana-Pena's statements were voluntary. Accordingly, the Court grants in part and denies in part the MTS.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)("[T]he Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not

implicated here." (citing <u>United States v. Matlock</u>, 415 U.S. 164, 172-77 (1974); <u>United States v. Sanchez</u>, 555 F.3d 910, 922 (10th Cir. 2009); <u>United States v. Miramonted</u>, 365 F.3d 902, 904 (10th Cir. 2004)).[1]

## 1.     Espanola Police Officers' Initial Interaction with Quintan-Pena.

1.      In the early morning hours of Wednesday, July 8, 2020, the Espanola Regional Emergency Communications Center dispatched Officer Jerome Broyles, a member of the Espanola Police Department, to a residential address in Espanola, New Mexico, in response to a caller advising that an unknown male in a grey Nissan was parked near her driveway and was "nodding off and on."  Dispatch Recording at 00:45-00:55 (dated July 8, 2020), admitted into evidence on April 23, 2024, as United States' Exhibit 2 ("Dispatch Recording"); Draft Transcript of Hearing at 8:3-6, taken April 23, 2022 (Court)(admitting Dispatch Recording into evidence)("Tr.").[2] <u>See</u> Tr. at 12:14-16 (Broyles).

---

[1]<u>United States v. Lopez-Carillo</u> is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Lopez-Carillo</u> and <u>Plascencia v. Taylor</u>, 514 F. App'x 711 (10th Cir. 2013) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2.    Upon arrival, Broyles found the grey Nissan parked on the side of the street, and observed a male, later identified as Quintana-Pena, asleep in the vehicle's front seat.  See Tr. at 13:8-20 (Broyles, Hirsch).

3.    Broyles provided Espanola Dispatch with the rear temporary-tag license plate that was displayed on grey Nissan, and learned from Espanola Dispatch that the license plate should have been displayed on a grey Dodge vehicle, which indicated to Broyles that the Nissan might be stolen.  See Tr. at 13:24-14:10 (Broyles, Hirsch).

4.    Broyles exited his patrol car and approached the driver's side of the vehicle to conduct a welfare check on Quintana-Pena.  See Tr. at 14:10-24 (Broyles, Hirsch); Jerome Broyles Lapel Camera Video Footage at 00:36-00:52 (dated July 8, 2020), admitted into evidence on April 23, 2024, as United States' Exhibit 3 ("Broyles Lapel Video"); Tr. at 8:3-6 (Court)(admitting Broyles Lapel Video into evidence).

5.    As Broyles approached the vehicle, he shined his flashlight into the vehicle's interior, and observed a large baseball-size, black, tar-like substance -- which Broyles knew from his experience and training to be heroin -- sitting inside of a silver and black box resting on Quintana-Pena's lap.  See Tr. at 15:20-16:12 (Broyles); Broyles Lapel Video at 00:58-01:03.

6.    As Broyles looked into the vehicle, a woman, later identified as Stephanie Salazar, approached Broyles from the direction of the house in front of which the vehicle was parked, and informed Broyles that Quintana-Pena had driven her in the vehicle to get a prescription earlier in the evening, had later returned to the vehicle after an argument, and that she wished to let Quintana-Pena come inside the house, which she explained was owned by her grandmother.  See Tr. at 17:16-23 (Broyles); Broyles Lapel Video at 01:03-01:32; id. at 06:40-08:00.

7.      After Officers Jose Lujan and James Haught arrived at the vehicle, Broyles gestured towards Quintana-Pena and asked the arriving officers: "Are you seeing what I'm seeing?" Broyles Lapel Video at 02:04-02:10. See Officer James Haught Lapel Camera Video Footage at 00:48-00:50 (dated July 8, 2020), admitted into evidence on April 23, 2024, as United States' Exhibit 4 ("Haught Lapel Video"); Tr. at 17:19-18:1 (Court, Hirsch, Shattuck)(admitting Haught Lapel Video into evidence).

8.      Gesturing again towards the black box, Broyles told Lujan to "look at this little fucking thing, bro," and Lujan observed the heroin.  Broyles Lapel Video at 02:14-02:15.

**2.      Officers Apprehend and Question Quintana-Pena.**

9.      As Lujan approached the front driver's-side door, Quintana-Pena awoke, closed the black box that was on his lap, and dropped the black box onto the floor of the vehicle's back seat. Broyles Lapel Video at 02:18-02:20; Haught Lapel Video at 00:56-01:03.

10.      Broyles opened the front driver's-side door and observed Quintana-Pena reach towards the side of his seat to drop the black box onto the floor of the vehicle's back seat, and, in response, drew his firearm and pointed it at Quintana-Pena, who raised his hands.  See Tr. at 26:6-8 (Broyles); Broyles Lapel Video at 02:20-02:24.

11.      Broyles and Lujan grabbed Quintana-Pena by his hands and pulled him out of the vehicle and onto his feet.  Broyles Lapel Video at 02:30-02:36.

12.      Broyles handcuffed Quintana-Pena's hands behind his back.  Broyles Lapel Video at 02:36-02:51.

13.      Broyles moved Quintana-Pena, who was still handcuffed, to the front of the vehicle, where he asked him what was in the black box.  Broyles Lapel Video at 03:12-03:14.

14.     Quintana-Pena stated: "I don't know, I was asleep, dude, I just woke up," to which Broyles responded: "I don't fall asleep holding random things either, man, so what was it." Broyles Lapel Video at 03:14-03:20.

15.     Before Quintana-Pena can answer, Broyles asked Quintana-Pena his name, age, and whether he "considers himself a man," and, after receiving responses from Quintana-Pena, explained that he doesn't "appreciate . . . people who steal -- not saying you stole -- but people who lie to me.  Broyles Lapel Video at 03:22-03:36.

16.     Broyles told Quintana-Pena: "If you lie to me at any point tonight -- and I will find out if you do, because your body gives away your signals if you lie -- you will go to jail tonight for something."  Broyles Lapel Video at 03:38-03:45.

17.     Quintana-Pena responded, "Okay," and Broyles proceeded: "So, it's better to be honest, man.  What the fuck is that black thing that's in that container?"  Broyles Lapel Video at 03:45-03:53.

18.     Quintana-Pena stated: "You know what it is," and Broyles asked again: "What is it?" to which Quintana-Pena stated: "Drugs."  Broyles Lapel Video at 03:54-03:56.

19.     Broyles asked what kind of drugs were in the black box, and Quintana-Pena responded that it was heroin.  See Broyles Lapel Video at 03:56-03:58.

20.     In response to Broyles question whether Quintana-Pena was selling the heroin, Quintana-Pena stated: "I was holding it for a friend," but informed Broyles that he was not selling the heroin.  Broyles Lapel Video at 03:59-04:04.

21.     Quintana-Pena informed Broyles that he was a heroin user.  See Broyles Lapel Video at 04:10-04:11.

22.     Broyles removed two small bags of drugs from Quintana-Pena's pocket and placed them on the vehicle's hood, stating: "That's a lot for a user."  Haught Lapel Video at 02:40-02:43.

23.     Officer James Haught, who was standing near the vehicles' front passenger-side door, interjected and asked Broyles: "You gonna Mirandize him?"  Haught Lapel Video at 02:58-03:01.

24.     Broyles brought Quintana-Pena to his patrol car and placed Quintana-Pena into the back seat, at which point Broyles advised Quintana-Pena of his Miranda rights.  See Broyles Lapel Video at 04:25-05:18; Tr. at 35:7-16 (Broyles, Shattuck).

25.     Quintana-Pena indicated that he understood his rights and that he wished to terminate the conversation. See Broyles Lapel Video at 05:18-05:42.

26.     After speaking briefly with Salazar, Broyles returned to Quintana-Pena and asked him if he knows his social identification number and to clarify his name and date of birth.  See Broyles Lapel Camera 08:32-09:28; id. at 10:50-12:15; 19:01-19:12.

27.     Broyles explained to Quintana-Pena that he noticed he was "nodding in and out," and asked whether Quintana-Pena recently used his heroin, stating that his question was "more of a medical question than anything else."  Broyles Lapel Camera 09:28-10:00.  See id. at 10:32-10:46.

28.     After searching the vehicle for a driver's license or other identification that could confirm Quintana-Pena's identity, Broyles returned to Quintana-Pena and asked him whether "he felt like he was going to overdose."  Broyles Lapel Camera 17:08-12:28.

**3.**      **Officers Search Quintana-Pena's Vehicle.**

29.      Haught, who arrived on scene shortly after Broyles, approached the vehicle's right side shortly after Broyles observed the open black box on Quintana-Pena's lap.  See Haught Lapel Video at 00:40-00:45.

30.      Broyles pointed to the black box and asked Haught and Lujan: "You seeing what I'm seeing."  Haught Lapel Video at 00:46-00:50.  See Broyles Lapel Video at 02:03-02:09.

31.      Haught looked through the front passenger-side window and observed the black box and the heroin sitting inside of the box.  See Haught Lapel Video at 00:50-00:57.

32.      When Quintana-Pena awoke, Haught observed Quintana-Pena drop the black box behind him, and Haught unholstered his firearm and pointed it at Quintana-Pena through the front passenger-side window, as Broyles pointed his gun at Quintana-Pena from the other side of the vehicle.  See Haught Lapel Video at 01:02-01:07.

33.      As Broyles and Lujan removed Quintana-Pena from the vehicle, Haught opened the front passenger-side door, while continuing to keep his firearm pointed at Quintana-Pena.  See Haught Lapel Video at 01:57-01:19.

34.      Haught briefly searched the vehicle's center console and clothing sitting on the front passenger-seat floor.  See Haught Lapel Video at 01:20-01:35.

35.      Haught holstered his gun and used his flashlight to look through the vehicle's rear passenger-side window, where he observed the black box that he saw Quintana-Pena drop behind his seat when the officers made contact with him.  See Haught Lapel Video at 01:36-01:48.

36.      Haught opened the rear passenger-side door, opened the black box, and discovered the baseball size amount of heroin in addition to several small bags containing narcotics.  See Haught Lapel Video at 01:49-02:32.

37.    After Broyles took Quintana-Pena to his patrol car, Haught proceeded to search the vehicle's front driver-side area, where he discovered a wallet and hand purse containing $2,341.00 in cash in a compartment on the driver-side door and a 9mm Rugar SR9 handgun under the driver-side seat.  See Haught Lapel Video at 03:26-05:15; Case Narrative #2007E0308 at 4, filed March 22, 2024 (Doc. 84-1)("Broyles Report").

38.    Broyles searched the vehicle for a driver's license or other identification that could confirm Quintana-Pena's identity and discovered Quintana-Pena's wallet including an EBT card, Social Security Card, and credit cards, all bearing his name.  See Broyles Lapel Video at 14:32:16:40; id. at 22:20-22:50; Hopp Lapel Video at 08:30-09:05; id. at 12:45-13:27; id. at 21:08-12.

39.    No officer sought nor obtained a search warrant prior to searching Quintana-Pena's vehicle.  See Tr. at 34:16-24 (Broyles, Shattuck).

40.    Quintana-Pena legitimately possessed the vehicle and had a reasonable expectation of privacy in the vehicle at the time of the search.[3]

---

[3]While the record does not establish who owned the vehicle, Quintana-Pena offered sufficient evidence at the April 23, 2024, suppression hearing to demonstrate that he was in lawful possession of the vehicle and was authorized to use it.  When the officers encountered Quintana-Pena, he was sitting in the driver's seat of the vehicle, which was running and parked in front of Quintana-Pena's girlfriend's house.  See Broyles Lapel Video at 02:38-02:42; id. at 00:36-01:03.  Salazar informed Broyles that Quintana-Pena had driven her in the vehicle earlier in the evening to get pick up a prescription and informed Broyles that the vehicle was Quintana-Pena's.  See Broyles Lapel Video at 06:30-07:18 ("He's been in his car ever since.").  At the hearing, Broyles testified that Salazar informed him that the vehicle was Quintana-Pena's.  See Tr. at 31:7-9. Finally, officers recovered from the vehicle Quintana-Pena's wallet including an EBT card, Social Security Card, and credit cards, all bearing his name.  See Broyles Lapel Video at 22:20-22:50; Hopp Lapel Video at 08:30-09:05; id. at 12:45-13:27; id. at 21:08-12. Based on a preponderance of this evidence, the Court concludes that Quintana-Pena had a reasonable expectation of privacy in the vehicle.

**PROCEDURAL BACKGROUND**

The Grand Jury charged Quintana-Pena with one count of Possession of 100 Grams and More of Heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), one count of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924, and one count of Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possessing a Firearm in Furtherance of Such Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). See Indictment at 1-2, filed August 25, 2020 (Doc. 2).  In a superseding indictment, the Grand Jury charged Quintana-Pena with three additional counts under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), 18 U.S.C. §§ 922(g)(1) and 924, and 18 U.S.C. § 924(c)(1)(A)(i).  See Superseding Indictment at 1-3, filed December 20, 2022 (Doc. 52).  Quintana-Pena filed the MTS on March 22, 2024, see MTS at 1, and the United States responded on April 11, 2024, see United States' Response in Opposition to Defendant's Motion to Suppress Evidence Based on Constitutional Violations, filed April 11, 2024 (Doc. 91)("Response").  The Court held an evidentiary hearing on  April 23, 2024. See Clerk's Minutes, filed April 23, 2024 (Doc. 94).

1.      **The MTS.**

In the MTS, Quintana-Pena "requests that the Court suppress and forbid the introduction of evidence of any and all statements obtained without [Miranda warnings] and any and all evidence related to the firearm, narcotics, and any other items recovered in the vehicle in which Mr. Quintana-Pena was found."  MTS at 1.  Quintan-Pena "submits that the initial investigation was unreasonable because it exceeded the scope of lawful community caretaker activity and constituted an illegal search for contraband without reasonable suspicion or probable cause."  MTS at 3.  Specifically, Quintana-Pena argues that the officers did not have reasonable suspicion to initiate contact with him, order him out of the car, or detain him, because they had no evidence of

any legal wrongdoing.  See MTS at 10.  Quintana-Pena claims that the weapon recovered under

the vehicle's driver's seat was a "pellet gun,"[4] and argues that neither possession of the pellet gun

nor sleeping in a legally parked car is "an indicator of a crime."  MTS at 11.  Quintana-Pena avers

that the officers did not have any indication that a crime had been committed until Quintana-Pena

had already been detained and the firearm was discovered.  See MTS at 10-11.

Quintana-Pena "anticipates that the Government will contend that the officers were acting

in their community caretaking capacity," but contends that this argument would be unsuccessful,

because officers did not have specific and articulable facts indicating that detaining Quintana-Pena

was necessary to protect the safety of Quintana-Pena, the officers, or others.  MTS at 12 (citing

Storey v. Taylor, 696 F.3d 987, 996 (10th Cir. 2012)).[5]  Quintana-Pena provides that, because

"[h]is car was not obstructing traffic" and "[h]e posed no danger to the public," "[i]f the Officers

were engaged in community caretaking, they would have approached [him], asked how he was

doing, and, if the property owner thought he was trespassing (again, this was not indicated), then

the officers could have asked him to leave."  MTS at 12.  See MTS at 13 ("[U]nder the totality of

the circumstances, officers may have been authorized, as a result of the 9-1-1 call, to ask Mr.

---

[4]Although Quintana-Pena asserts that the weapon found below his seat was a pellet gun, he later acknowledges that it may be a firearm, see MTS at 11 ("The existence of either a pellet gun or an actual firearm did not give rise to reasonable suspicion of criminal activity."), and the Court finds by a preponderance of the evidence that it was a firearm, see FOF ¶ 37, at 9.

[5]In his argument that the United States cannot invoke the community caretaking exception, Quintana-Pena refers to an individual named "Mr. Purvis."  MTS at 12.  The Court, however, understands this to be a misstatement and will treat references to Mr. Purvis as references to Quintana-Pena.  Moreover, despite that the references to Mr. Purvis contain discussion of facts that are inapposite to this case -- for example, the unknown Mr. Purvis "was asleep in a parked car in a Wal-Mart parking lot" -- the Court understands the general thrust of Quintana-Pena's argument, i.e., that the United States cannot invoke the community caretaking exception to render evidence inappropriately obtained admissible, to apply to his situation.  MTS at 12.

Quintana-Pena if he was okay or needed assistance.").  Quintana-Pena avers that his encounter with police officers was all the more troubling because Salazar informed officers that he "was a friend of hers and she was coming to invite him into [t]he residence."  MTS at 13.

2.     **The Response**.

The United States responds that the search of Quintana-Pena's vehicle was justified under "several separate independent legal doctrines, each of which is sufficient to deny the Motion." Response at 6.  The United States argues that Broyles "using a flashlight to illuminate[] the Nissan's passenger compartment" while lawfully present on a public road did not infringe on Quintana-Pena's Constitutional rights.  Response at 6 (citing Texas v. Brown, 460 U.S. 730, 739-40 (1983)).  The United States explains that Broyles observed heroin in plain view on Quintana-Pena's lap, which provided him with probable cause to search the vehicle pursuant to the vehicle exception to the warrant requirement.  See Response at 6-7.  This probable cause, the United States contends, extends "to search not only the vehicle, but most containers within it."  Response at 7 (citing United States v. Ross, 456 U.S. 798, 800 (1982)).

The United States avers that Quintana-Pena's argument that the "officers lacked reasonable suspicion to allow for an investigatory detention based solely on their observation of a firearm . . . is irrelevant because the heroin, not the firearm, justified the search."  Response at 7. In addition, the United States provides that "[t]he community caretaking exception is similarly irrelevant, given that officers had probable cause to believe that a crime had been committed. Response at 7.  Moreover, the United States argues, the "subsequent search of the remainder of the Nissan's passenger compartment was clearly permitted" as a search incident to arrest, because it was "'reasonable to believe that evidence of the offense of arrest might be found in the vehicle.'" Response at 7-8 (quoting Arizona v. Gant, 556 U.S. 332, 343 (2009)).

The United States concludes that, even if Quintana-Pena "was arrested before he made any incriminating statements," his motion to suppress the statements he made before officer Broyles advised him of his <u>Miranda</u>-rights "is moot because the United States will not seek to introduce his pre-<u>Miranda</u> statements in its case in chief."  Response at 8.  In addition, the United States argued that "[t]he suppression of these statements does not make the drugs recovered from the Nissan the fruit of the 'poisonous tree doctrine.'"  Response at 8 (quoting MTS at 13).  The United States explains that "[o]ther officers discovered the larger quantities of heroin even before Officer Broyles elicited any admissions from Defendant," and the statements Quintana-Pena made were unnecessary "to confirm that the substance they found was heroin" and the officers' discovery of the firearm was unrelated to any statements Quintana-Pena made.  Response at 8.

**3.**      **The Hearing.**

At the April 23, 2024, hearing, Quintana-Pena began by arguing that Broyles did not have reasonable suspicion when he approached Quintana-Pena's car, because "[t]here was no indication of criminal activity in the car."  Tr. at 4:1-2 (Shattuck).  Any reasonable suspicion Broyles may have had when he arrived at Quintana-Pena's vehicle, Quintana-Pena argued, is "overcome" by Salazar informing officers that she "came to tell him to come inside."  Tr. at 7:17-25 (Shattuck). Although Quintana-Pena acknowledged that, if Broyles had reasonable suspicion when he approached Quintana-Pena's vehicle, "there is Tenth Circuit case law that says that they're allowed to search the car without a warrant," he clarified that officers were not permitted to search "containers inside the car."  Tr. at 6:13-19 (Shattuck).  Quintana-Pena averred that, because the officers "were in control of the car," there were "no exigent circumstances," and they "should have gotten a search warrant to search the car, period."  Tr. at 8:11-19 (Shattuck).

In response, the United States argued that, as an initial matter, Quintana-Pena must demonstrate some control over the vehicle and an "expectation of privacy in the vehicle" in order to have standing to seek suppression of the evidence officers found in the vehicle.  Tr. at 9:5-10:11 (Court, Hirsch).  The United States continued that there is no need to assess Broyles' reasonable suspicion or consider the community caretaking exception, because Broyles was lawfully present on a public road and observed what he knew from his training and experience to be heroin on Quintana-Pena's lap, which gave him probable cause to search the vehicle and to arrest Quintana-Pena.  See Tr. at 10:12-11:16 (Hirsch); id. at 11:18-21 ("[T]he only fact that matters in this case is whether the officer, in fact, saw a ball of heroin in the defendant's lap.  Everything else is essentially irrelevant.").  Specifically, the United States explained that observing the heroin allowed officers to search the vehicle under the vehicle exception to the warrant requirement or as a search incident to the arrest.  See Tr. at 12:9-17 (Hirsch).

After Broyles provided testimony, Quintana-Pena briefly addressed the issue of standing, averring that Quintana-Pena had standing to seek the suppression of the evidence found in the vehicle, because the facts establish that his was "in possession" of and "rightfully in the car."  Tr. at 43:7-13 (Shattuck).  Quintana-Pena argued that the officers violated his Constitutional rights when they went "beyond the welfare check and beg[an] an investigation" after Salazar informed the officers that Quintana-Pena was with her.  Tr. at 45:8-17 (Shattuck).  Quintana-Pena contended that the officers "jumped the gun," when they searched the vehicle without a warrant, because the search was not incident to Quintana-Pena's arrest, because he was not arrested until after the search had commenced.  Tr. at 46:2-21 (Shattuck).  Quintana-Pena clarified that "even the case law that says that they can search the car without a warrant says that it's incident to arrest."  Tr. at 46:21-23 (Shattuck).  Even though officers removed him from the vehicle, handcuffed him, and moved

him away from the vehicle, Quintana-Pena contended, he was not under arrest because the officers had not yet told him that he was under arrest.  See Tr. at 49:3-13 (Shattuck).

The United States responded by reiterating that it meets its burden to establish that the officers' warrantless search of Quintana-Pena's vehicle falls within an exception to the warrant requirement on two separate bases.  See Tr. at 50:7-11 (Hirsch).  First, the United States argued that the search is permitted because it was "a vehicle search," Tr. at 50:11-12 (Hirsch), and second as a search incident to arrest, which allowed the officers to "search for the offense of arrest," Tr. at 50:15-51:13 (Court, Hirsch).  The United States explained that it believed that Quintana-Pena "was under arrest at the time that officers pulled him out of the car, handcuffed him, and had a gun pointed at him," which is why the United States conceded that it would not use any of the statements Quintan-Pena made before Broyles provided him with a Miranda warning.  Tr. at 51:20-52:6 (Hirsch).  The United States stated: "Officers don't have to tell him formally that he's under arrest for him to be under arrest."  Tr. at 52:6-8 (Hirsch).  The Court informed the parties that it will deny the motion, because the officers had probable cause to search the vehicle, but stated that it agreed that the "pre-Miranda statements do need to stay out," because the arrest occurred when Quintana-Pena was removed from the vehicle.  Tr. at 53:8-54:4 (Court).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that

existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (1978))).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).   See United States v. Knapp, 917 F.3d 1161, 1165 (10th Cir. 2019)("The warrantless search rule, however, is subject to several exceptions.").

1.    **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth

Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

      "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

      As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (quoting Skinner v. Ry. Labor Executives'

Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness

under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise
> definition or mechanical application.   In each case [determining reasonableness]
> requires a balancing of the need for the particular search against the invasion of
> personal rights that the search entails.   Courts must consider the scope of the
> particular intrusion, the manner in which it is conducted, the justification for
> initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the

individual's privacy expectations.   See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting

that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because

a condition of his probation was to consent to search of his apartment without notice or probable

cause, and because he was clearly notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited

expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the

fourth amendment for a person on conditional release, or a felon, may be unreasonable for the

general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining

and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure

implicating Fourth Amendment concerns, it is a reasonable search and seizure.   This is so in light

of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what

government intrusions are reasonable: "It is not surprising that in a case involving a search of a

home, property concepts and privacy concepts should so align.   The law of property 'naturally

- 18 -

enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Florida v. Jardines, but not in Georgia v. Randolph). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

### 2. Vehicle Searches.

One exception to the Fourth Amendment search-warrant requirement is the automobile exception, which allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. See Collins v. Virginia, 584 U.S. 586, 591-92 (2018). While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant is generally not required. See Carroll v. United States, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" unlike "a store, dwelling house, or other structure"). The ongoing exigent circumstance that the

vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v. Dyson, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'")(citing United States v. Ross, 456 U.S. at 809)(emphasis added in Maryland v. Dyson); California v. Carney, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police"); Collins v. Virginia, 584 U.S. at 596 (declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility).

Thus, if the vehicle is readily mobile, "probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."  United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)).  The scope of a warrantless vehicle search is defined by the object of the search and the places in which there is probable cause to believe that it may be found.  United States v. Ross, 456 U.S. 798, 824 (1982).  Accordingly, if probable cause justifies a vehicle search, it justifies the search of every part of the vehicle in which the evidence might be found, including closed compartments, containers, packages, and trunks, and any contents or containers that may conceal the object of the search.  See California v. Acevedo, 500 U.S. 565, 574 (1991); Wyoming v. Houghton, 526 U.S. 295, 304-07 (1999); United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).

3.      **Searches Incident to Arrest**.

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest."

Arizona v. Gant, 556 U.S. 332, 338 (2009)("Gant").  The exception "derives from interests in

officer safety and evidence preservation that are typically implicated in arrest situations."  Gant,

556 U.S. at 338.   The search-incident-to-lawful-arrest exception enables the search "of the

arrestee's person" in addition to "the area within the arrestee's 'immediate control.'"  United States

v. Knapp, 917 F.3d at 1165 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).   The

Supreme Court has defined the area within the arrestee's "immediate control" as "the area from

within which he might gain possession of a weapon or destructible evidence," Chimel v.

California, 395 U.S. at 763, a limitation that "ensures that the scope of a search incident to arrest

is commensurate with its purposes of protecting arresting officers and safeguarding any evidence

of the offense of arrest that an arrestee might conceal or destroy," Gant, 556 U.S. at 339.

The search-incident-to-lawful-arrest exception may also enable a search of an automobile

where a recent occupant is placed under arrest. See New York v. Belton, 453 U.S. 454, 459-60

(1981).  An automobile search incident to a recent occupant's arrest is Constitutional if: (i) "the

arrestee is within reaching distance of the vehicle during the search"; or (ii) "if the police have

reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'"  Davis v.

United States, 564 U.S. 229, 235 (2011)(quoting Gant, 556 U.S. at 343).  See United States v.

Knapp, 917 F.3d at 1168 (explaining that automobile searches incident to a lawful arrest under

Gant "are justified either by the 'twin rationales of Chimel' or by an arresting officer's reasonable

belief that the vehicle contains evidence of the crime precipitating the arrest" (quoting Gant, 556

U.S. at 342-43)).  Although a search incident to arrest must be a "contemporaneous incident of [a

lawful] arrest," New York v. Belton, 453 U.S. at 460, it is of no moment that a search precedes an

arrest, so long as "probable cause for the arrest precede[s] the search," United States v. Smith, 389 F.3d 944, 952-53 (9th Cir. 2004).

### LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures. See U.S. Const. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007)(quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). See United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at

minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

### 1.     Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

### 2.     Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit noted: "Terry was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968); and then quoting Terry v. Ohio, 392 U.S. at 27).  The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."  United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989);

Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explained:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

### a.    Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a constitutional investigative detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d at 1118.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making

the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

   **b.** **Frisks.**

   A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

   **c.** **Traffic Stops.**

   "'A traffic stop is a seizure within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th

Cir. 1998)).  "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'" United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'"  United States v. Wilson, 96 F. App'x at 644 (alterations in original)(quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).  "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction."  United States v. Winder, 557 F.3d at 1134.

   3.    **Arrests.**

   An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention,"  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)), that is "reasonable only if supported by probable cause,"  United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018).  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, see United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[6]  United States v. Melendez-Garcia,

--------

   [6]The use of handcuffs, however, does not always elevate a detention into an arrest.
See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of

28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).   See  Wilson  v.  Jara,  866  F. Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy  search  or  detention.'"  (quoting  Oliver v. Woods,  209  F.3d  at  1185)),  aff'd,  512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less

---

handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . .  does not always elevate a detention into an arrest.").

reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

### a.    **When a Detention Becomes an Arrest**.

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an

arrest.   In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub

nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the

Court had to determine whether the police transformed the investigative detention into an arrest

by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police

car.   See United States v. Perea, 374 F. Supp. 2d at 976.   In that case, the Court determined that

such measures were appropriate and did not elevate the investigative detention to the level of an

arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers

effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop

is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974 (quoting United

States v. Perdue, at 1463).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming

the Court's determination in United States v. Perea that the officers had reasonable suspicion to

believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and

not transforming the vehicle stop into a formal arrest requiring probable cause); United States v.

Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques

are justified only by probable cause or when 'the circumstances reasonably warrant such

measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

   There "exist[s], however, a limited set of circumstances in which officers may draw their

guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with

a stop is permissible where the police reasonably believe the weapons are necessary for their

protection.'"  United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at

1462).   See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of stop when officers detained the defendant at gunpoint, and placed him in

handcuffs where suspect had threatened to kill someone and was pounding interior of truck with

his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's

"drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United

States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers

did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when

they suspected that the defendant had "just completed a narcotics purchase," there were a number

of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially

hazardous and supports the need for added safeguards").   Similarly, there are circumstances in

which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.

See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th

Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable

precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir.

1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action

designed to provide for the safety of the agents.").   United States v. Perea was one of those unique

cases, because the police had reasonable cause to believe that the person whom they were detaining

was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed,

might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's

determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to
> the perceived threat. The measures taken during a *Terry* stop must be "reasonably
> related in scope to the circumstances which justified the interference in the first
> place" and may not go beyond what is necessary for officer safety.  *United States v.*
> *King*, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting *Terry v. Ohio,* 392 U.S. 1, 20  .
> . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade
> might have a gun, or at least was dangerous.  The officers displayed their weapons
> only as long as necessary to ensure that the vehicle and its occupants posed no
> threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga,
> placed him in the back of a police car, and confirmed that no one else was in the

car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

**b.      Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

## LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'"   United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444).  A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)).  The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

1.      __Custodial Interrogation.__

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial interrogation context.  See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991).    See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order to implicate Miranda and Edwards,[7] there must be a custodial interrogation.").  "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444).  There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina)).  See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).  "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)).  A suspect's Miranda rights, such as a suspect's right to counsel,

---

[7]Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.

may trigger before a law-enforcement officer gives a <u>Miranda</u> warning.   See <u>United States v.</u> <u>Bautista</u>, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry.   See <u>United States v. Cash</u>, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'"   (alterations in <u>United States v.</u> <u>Cash</u>)(quoting <u>Fox v. Ward</u>, 200 F.3d 1286, 1298 (10th Cir. 2000)).   A suspect in custody may not invoke his <u>Miranda</u> rights if he is not also interrogated.   See <u>Rhode Island v. Innis</u>, 446 U.S. 291, 293, 300 (1980).   Interrogation does not require "express questioning of a defendant while in custody."   <u>Rhode Island v. Innis</u>, 446 U.S. at 298-99.   The Supreme Court explained that <u>Miranda</u> was concerned with more than just questioning, but also the "'interrogation environment,'" which implicated practices that "did not involve express questioning."   <u>Rhode Island v. Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 458).   "For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation."   <u>Rhode Island v. Innis</u>, 446 U.S. at 299 (citing <u>Miranda</u>, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

<u>Rhode Island v. Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 453).   Accordingly, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. at 301 (quoting <u>Miranda</u>, 384 U.S at 439).   See <u>United States v.</u>

Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response."  (emphasis added by United States v. Cash)(quoting Fox v. Ward, 200 F.3d at 1298). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  Rhode Island v. Innis, 446 U.S. at 301.  See United States v. Yepa, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation."  Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation).  The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent."  United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")).  See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning.").  The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey.  In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent.  United States v. Cash, 733 F.3d at 1278-79.  Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode

Island v. Innis commands.  United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301).  See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions.  In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was subjected to interrogation, but was not in custody, so Miranda did not apply.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning."  743 F. Supp. 2d at 1334.  The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under

arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

2.  **Miranda Waiver.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently."  United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted).  An express statement is not required; the waiver can be inferred from the defendant's actions and words.  See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)).  "Whether

this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach. See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573). "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)). A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993). "Rather the test is 'whether a [suspect's] will was overborne by the circumstances

surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.   See United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

### 3.      Requests for an Attorney.

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or

conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85.  See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation.  Maryland v. Shatzer, 559 U.S. 98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988) (Arizona v. Roberson quoting Miranda, 384 U.S. at 467)).  Accordingly, "a voluntary *Miranda*

waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." Maryland v. Shatzer, 559 U.S. at 105. The Supreme Court noted, however, that the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis." Maryland v. Shatzer, 559 U.S. at 105.[8] A break in custody of fourteen days or more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel. See Maryland v. Shatzer, 559 U.S. at 110.

The request for counsel must be clear and unequivocal. See Davis v. United States, 512 U.S. at 459. A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel." Davis v. United States, 512 U.S. at 453. An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. Davis v. United States, 512 U.S. at 453 (emphasis in original). The Supreme Court later explained:

[8]But see Dickerson v. United States, 530 U.S at 460; infra n.19.

- 41 -

"If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)(quoting Davis v. United States, 512 U.S. at 461).  "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity."  Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel.  512 U.S. at 462.  See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements).  In United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel."  United States v. Santistevan, 701 F.3d at 1292-93.  Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop.  United States v. Santistevan, 701 F.3d at 1293.  In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant

did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer.  United States v. Lux, 905 F.2d at 1381.  See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood his Miranda rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under *Davis*."); United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(collecting appellate court cases).   The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel.  United States v. Alfaro, No. CR 08-0784, 2008 WL 5992268, at *13 (D.N.M. December 17, 2008)(Browning, J.).  See United States v. Martinez, No. CR 02-1055, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4.    **Midstream Miranda Warnings**.

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case.  In Elstad, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  See Elstad, 470 U.S. at 300.  Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad

admitted that he was involved in the burglary.  See Elstad, 470 U.S. at 301.  The detectives then

escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See 470 U.S. at 301.

Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police

to provide Miranda warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's

fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he

contended that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court

disagreed with Elstad, concluding that "procedural Miranda violation[s] differ[] in significant

respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations added).  It

explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does

not necessarily mean that there was a constitutional violation.  See Elstad, 470 U.S. at 306-07.  The

Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer Miranda

warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements

that are otherwise voluntary" are nevertheless barred under Miranda.  Elstad, 470 U.S. at 306-07.

Thus, the "Miranda exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth

Amendment itself."  Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[9]

_____

[9]There is tension in this reasoning and with the Supreme Court's later determination in
Dickerson that Miranda is a constitutional rule.  See Dickerson, 530 U.S. at 437-38, 441.  In
Dickerson, although conceding that "we have repeatedly referred to the Miranda warnings as
'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at
437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S.
433, 444 (1974)), the Supreme Court concluded that "Miranda is a constitutional decision,"
because (i) it had consistently applied Miranda to state court decisions and (ii) Miranda had invited
legislative action "to protect the constitutional right against coerced self-incrimination,"

Dickerson, 530 U.S. at 438-40.  If Miranda is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself."  Elstad, 470 U.S. at 306.  It is possible that the Supreme Court meant that Miranda implicated additional constitutional amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the Supreme Court meant that Miranda's exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth.  See Elstad, 470 U.S. at 305; Elstad, 470 U.S at 307 ("Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension, noted that Elstad "does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."  Dickerson, 530 U.S. at 441.  But see Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with Miranda's rules does not establish a constitutional violation was central to the holdings of [Michigan v.] Tucker, [530 U.S. 428 (2000)], [Oregon v.] Hass, [420 U.S. 714 (1975)], [New York v.] Quarles, [467 U.S. 649 (1984)], and Elstad.")(emphasis in original)(alterations added).

Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning.  See United States v. Patane, 542 U.S. 630 (2004)("Patane")(plurality op.)("Based on its understanding of Dickerson, the Court of Appeals rejected the post-Dickerson views of the Third and Fourth Circuits that the fruits doctrine does not apply to Miranda violations.").  See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in Patane, but a divided court did not produce a controlling opinion.  See Patane, 542 U.S. at 635-36.  The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause.  Patane, 542 U.S. at 636.  The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy.  See Patane, 542 U.S. at 643.  It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy.  See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial.").  In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound.  Patane, 542 U.S. at 639-40.  The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment and agreed that Elstad is still good law after Dickerson.  See Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The two Justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed.  Patane, 542 U.S. at 645.  They concluded that admitting nontestimonial fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  Instead of concluding that such a

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its

---

remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda.  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's Constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be.  See Elstad, 470 U.S. at 308.  Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonial evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules.  See Maryland v. Shatzer, 559 U.S. at 106.  It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise

loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S.

at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court

held that, once the Miranda warning is made, "the admissibility of any subsequent statement

should turn . . . solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309.

See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was

also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding

circumstances and the entire course of police conduct with respect to the suspect in evaluating the

voluntariness of his statements.").

        Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-

Miranda confessions were voluntary, and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It

noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions,

the change in place of interrogations, and the change in identity of the interrogators all bear on

whether that coercion has carried over into the second confession."  Elstad, 470 U.S. at 310.

However, where the initial confession is voluntary, "a break in the stream of events" is not needed

for the second confession to be admissible.  Elstad, 470 U.S. at 310.  Rather, the Miranda warning

"serves to cure the condition that rendered the unwarned statement inadmissible."  Elstad, 470

U.S. at 311.

        In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in

Elstad's living room with his mother "a few steps away," so it was voluntary.  Elstad, 470 U.S. at

315.  With no additional facts demonstrating that the second confession, post-Miranda was elicited

under coercive conditions, the Supreme Court deemed it admissible.  See Elstad, 470 U.S. at 314.

That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United

States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way created a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314.   Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions."   Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion. Seibert, 542 U.S. at 603-05.[10] In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores.   See Seibert, 542 U.S. at 604.   The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it.   See Seibert, 542 U.S. at 604.   To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it.   See Seibert, 542 U.S. at 604.   The conspirators executed their plan, and Rector died in the fire.   See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother.   See Seibert, 542 U.S. at 604.   Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police

---

[10]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court.   See Seibert, 542 U.S. at 603.   Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment.   See Seibert, 542 U.S. at 617-18.   Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented.   See Seibert, 542 U.S. at 622.

headquarters.  See Seibert, 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at

the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted

that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break,

Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same

confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to

Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a

sanctioned interrogation technique that he had been taught: "question first, then give the warnings,

and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda

warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court

further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that

individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384

U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," Seibert, 542

U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings
> until after interrogation succeeds in eliciting a confession, the warnings will be
> ineffective in preparing the suspect for successive interrogation, close in time and
> similar in content. . . .  Upon hearing warnings only in the aftermath of interrogation
> and just after making a confession, a suspect would hardly think he had a genuine
> right to remain silent, let alone persist in so believing once the police began to lead
> him over the same ground again. . . .  What is worse, telling a suspect that "anything
> you say can and will be used against you," without expressly excepting the
> statement just given, could lead to an entirely reasonable inference that what he has
> just said will be used, with subsequent silent being of no avail.  Thus, when
> *Miranda* warnings are inserted in the midst of coordinated and continuing
> interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge
> essential to his ability to understand the nature of his rights and the consequences

of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)).  But see Seibert, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of the bag" theory that the Supreme Court rejected in Elstad).  Accordingly, the plurality held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream Miranda warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-Miranda phase left "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasted <u>Seibert</u> with <u>Elstad,</u> and concludes that the officer's failure to warn in <u>Elstad</u> was a good faith <u>Miranda</u> mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'" <u>Seibert</u>, 542 U.S. at 615 (quoting <u>Elstad</u>, 470 U.S. at 313). "In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience." <u>Seibert</u>, 542 U.S. at 615. Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room. 542 U.S. at 614. Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." <u>Seibert</u>, 542 U.S. at 617 (Breyer, J., concurring). He joined "the plurality's opinion in full," however, because he believed that "the plurality's approach in practice will function as a 'fruits' test." <u>Seibert</u>, 542 U.S. at 618 (Breyer, J., concurring)(quoting <u>Wong Sun v. U.S.</u>, 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test. <u>Seibert</u>, 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolated a general principle from the Supreme Court's <u>Miranda</u> cases: "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." <u>Seibert</u>, 542 U.S. at 618-19 (Kennedy, J., concurring). From that general principle, he concluded that an officer's deliberate intent to withhold a <u>Miranda</u> warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest." <u>Seibert</u>, 542 U.S. at 621

(Kennedy, J., concurring).  He disagreed with the plurality, however, because the test the plurality

articulated "cuts too broadly."  <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every
> two-stage interrogation may serve to undermine that clarity.  Cf. *Berkemer v.*
> *McCarty*, 468 U.S. 420, 430 . . . (1984).  I would apply a narrower test applicable
> only in the infrequent case, such as we have here, in which the two-step
> interrogation technique was used in a calculated way to undermine the *Miranda*
> warning.

<u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).  Accordingly, Justice Kennedy articulated the

following test:

> The admissibility of postwarning statements should continue to be governed
> by the principles of *Elstad* unless the deliberate two-step strategy was employed.
> If the deliberate two-step strategy has been used, postwarning statements that are
> related to the substance of prewarning statements must be excluded unless curative
> measures are taken before the postwarning statement is made.

<u>Seibert</u>, 542 U.S at 622 (Kennedy, J., concurring).[11]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas,

dissented.  <u>See</u> <u>Seibert</u>, 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting justices

concluded that <u>Elstad</u>'s voluntariness inquiry should control, and not a multi-factor balancing test

or a subjective-intent test.  <u>See</u> <u>Seibert</u>, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).

According to those justices, a test focusing on the officer's subjective intent missed the mark,

because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's

state of mind is irrelevant.  <u>Seibert</u>, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept

inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach,

---

[11]The Supreme Court later applied <u>Seibert</u> in a per curiam review of a habeas petition, but
it did not resolve which test was controlling as it applied both the plurality's factors and factors
which Justice Kennedy's concurrence articulated.  <u>See</u> <u>Bobby v. Dixon</u>, 565 U.S. 23, 30-32
(2011)(per curiam).

on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad. 542 U.S. at 627 (O'Connor, J., dissenting). The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad. 542 U.S. at 627 (O'Connor, J., concurring)(alteration in original). The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity." 542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original). Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made. See 542 U.S. at 628 (O'Connor, J. dissenting).

In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit held that "Justice Kennedy's concurrence is the binding opinion from Seibert." 995 F.3d at 1114. The Tenth Circuit arrived at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'" United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))). The Tenth Circuit explains that Justice Kennedy concurred with the plurality on the narrowest grounds and is "'a logical subset'" of the plurality opinion. United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006). The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's Seibert opinion provides the controlling standard for assessing the admissibility of

incriminating statements given subsequent to midstream *Miranda* warnings." United States v. Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

### LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily. See Dickerson, 530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Jackson v. Denno, 378 U.S. 368, 376 (1964)(citation omitted).

The Supreme Court has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted). The United States must show that the statement was voluntary by a preponderance of

the evidence.  See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)).  The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."  Dickerson, 530 U.S. at 434 (internal quotations omitted)(citations omitted).

The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing."  Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)).  The Supreme Court reaffirmed this analysis in 2000.  See Dickerson, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").  The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986).  In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct."  Colorado v. Connelly, 479 U.S. at 164.

The Court analyzed voluntariness in United States v. Martinez, No. CR 02-1055, 2006 WL 4079686, at *13-14 (D.N.M. November 21, 2006)(Browning, J.).  There, it concluded that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only

about two hours.  See 2006 WL 4079686, at *14.  While the defendant argued that agents had made promises of leniency to him, the Court concluded that "the agents indicated to him that they could not make him any promises," and that his fate was in the hands of the judge and prosecutors. 2006 WL 4079686, at *14.  The defendant also signed a Miranda waiver and a statement that no promises had been made to him.  2006 WL 4079686, at *14.

## LAW REGARDING THE EXCLUSIONARY RULE

"When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies."  United States v. Neugin, 958 F.3d 924, 931 (10th Cir. 2020).  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  "In addition, a defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence."  United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-

Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

      **1.**      **Attenuation Doctrine.**

One exception to the exclusionary rule is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence."  Utah v. Strieff, 136 S. Ct. at 2061.  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine.  See 468 U.S. at 799-801, 814.  There, agents had probable cause to believe that apartment occupants were dealing cocaine.  See 468 U.S. at 799-800.  They sought a warrant.  See 468 U.S. at 799-800.  In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep.  See 468 U.S. at 800-01.  The next evening, they obtained a search warrant.  See 468 U.S. at 800-01.  The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry."  468 U.S. at 814.  The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States, 564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant."  Utah v. Strieff, 136 S. Ct. at 2063.  Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation."  Utah v. Strieff, 136 S. Ct. at 2063.  See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

2.      **Good-Faith Exception**.

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence through an unlawful search or seizure acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011).   To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).   The Supreme Court has explained "that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)).   Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144).   By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).   "In those situations, officers act with an 'objectively reasonable good-faith belief that their conduct is lawful,' . . . precluding the application of the exclusionary remedy." United States v. Pemberton, 94 F.4th 1130, 1137 (10th Cir. 2024)(quoting United States v. Davis, 564 U.S. at 257).

The good-faith exception most commonly arises in the context of warrant-based searches to allow entry of evidence obtained by officers acting "in objectively reasonable reliance on a

warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid."

Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984). "When a search is conducted pursuant

to a warrant that is based on illegally obtained information," however, "a court is not to blindly

apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the

court is to consider the warrant with the illegally obtained information excluded and determine,

based on the remaining information, whether probable cause nevertheless existed." United States

v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes

probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be

excluded:

> When a warrant is tainted by some unconstitutionally obtained information,
> we nonetheless uphold the warrant if there was probable cause absent that
> information. "An affidavit containing erroneous or unconstitutionally obtained
> information invalidates a warrant if that information was critical to establishing
> probable cause. If, however, the affidavit contained sufficient accurate or untainted
> evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458,
> 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v.

Bullcoming, 22 F.4th 883, 890-92 (10th Cir.), cert. denied, 142 S. Ct. 2805 (2022). "The apparent

rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains

information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d

at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

In United States v. Leon, the Supreme Court concluded that a court need not suppress

evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause,

as long as police were acting in good-faith reliance on that warrant. See 468 U.S. at 922-23. See

468 U.S. at 905. The Supreme Court noted that excluding this evidence would not deter police

misconduct, as the officer had taken all of the necessary steps to comply with the Fourth

Amendment and reasonably thought his warrant, and, thus, his search, was valid.  See 468 U.S. at

918-19.  The Supreme Court explained that, when a warrant is issued on less than probable cause,

the person whose conduct the law wishes to deter is the issuing judge and that excluding the

evidence would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-

17.  "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a

warrant but the affidavit supporting the warrant does not establish probable cause, suppression of

the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant."     United States v. Martinez,  696  F. Supp. 2d  1216, 1244  (D.N.M.

2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United

States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be
> ordered . . . only in those unusual cases in which exclusion will further the purposes
> of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . .  "Where an
> officer acting with objective good faith obtains a search warrant from a detached
> and neutral magistrate and the executing officers act within its scope, there is
> nothing to deter."  *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.

Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith

when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States

v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth."  [United States v.
> Leon, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the
> "issuing magistrate wholly abandon[s her] judicial role."  *Id.*  Third, the good-faith
> exception does not apply when the affidavit in support of the warrant is "so lacking
> in indicia of probable cause as to render official belief in its existence entirely

unreasonable." *Id.* (quotation omitted). Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded." United States v. Romero, 743 F. Supp. 2d at 1316.

In Herring v. United States, the Supreme Court clarified that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 144. Officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database, and discovered drugs and a gun on Herring's person during a search incident to arrest. See 555 U.S. at 137. Herring was then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See 555 U.S. at 138.

The Supreme Court concluded that, although the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). The Supreme Court further explained that "evidence should be suppressed

only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996). Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are

deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court stated: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

### 3.    Inevitable-Discovery Exception.

Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means."  United States v. Braxton, 61 F.4th 830, 833 (10th Cir. 2023)(quoting United States v. Neugin, 958 F.3d at 931).  See United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  The Tenth Circuit has clarified, however, that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'"  United States v. Christy, 739 F.3d at 540-41 (quoting United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997).

The Tenth Circuit has urged courts to consider "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." United States v. Owens, 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). Accordingly, "courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

The Tenth Circuit has further explained that, "[w]hile the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search, the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000). The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. In United States v. Souza, 223 F.3d 1197, the Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). See United States v. Cunningham, 413 F.3d at 1204-05 (applying the four

factors outlined in <u>United States v. Souza</u>).   In <u>United States v. Christy</u>, the Court applied the four <u>United States v. Souza</u> factors and determined that the inevitable-discovery exception applied.   <u>See</u> 810 F. Supp. 2d at 1275-79.

## ANALYSIS

The Court will grant in part and deny in part the MTS.   Quintana-Pena moves to suppress the evidence obtained during his July 8, 2020, encounter with law enforcement as well as the statements he made to Broyles during the encounter.   <u>See</u> MTS at 1.   The Court first concludes that the warrantless search of Quintana-Pena's vehicle was justified: (i) under the automobile exception to the warrant requirement, because the officers had probable cause to search the vehicle and containers within the vehicle when they observed heroin on Quintana-Pena's lap from the street on which the officers were lawfully present; and (ii) as a an automobile search incident to Quintana-Pena's arrest, because officers had reason to believe that the vehicle contained evidence relevant to the crime of arrest.   Furthermore, the Court will suppress the statements Quintana-Pena made to Broyles, because Broyles failed to provide Quintana-Pena with a <u>Miranda</u> warning when before he conducted a custodial interrogation of Quintana-Pena.   The Court will not, however, suppress any of the physical evidence discovered in Quintana-Pena's vehicle on the basis that Broyles failed to provide a <u>Miranda</u> warning, because there is no causal link between the violation and the discovery of the contraband, the doctrine of inevitable discovery applies, and Quintana-Pena's statements were voluntary.

I.      **QUINTANA-PENA IS NOT ENTITLED TO SUPPRESSION OF THE EVIDENCE OBTAINED DURING THE WARRANTLESS SEARCH, BECAUSE THE SEARCH WAS JUSTIFIED BY THE AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT AND AS A SEARCH INCIDENT TO QUINTANA-PENA'S LAWFUL ARREST.**

The Fourth Amendment establishes a right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV.  Because "an individual's privacy interest in her automobile is constitutionally protected," the Fourth Amendment's protection applies to vehicle searches.  Romo v. Champion, 46 F.3d 1013, 1017 (10th Cir. 1995).[12]  "'[T]he ultimate touchstone of the Fourth Amendment,' as the text makes clear, 'is reasonableness' . . . [a]nd reasonableness 'generally requires the obtaining of a judicial warrant before law-enforcement officers may" conduct a search.

---

[12]The Court concludes that Quintana-Pena possessed a reasonable expectation of privacy in the vehicle.  At the hearing, the United States asserted that Quintana-Pena must demonstrate his standing to seek suppression of the evidence discovered in the vehicle he occupied.  See Tr. at 9:14-18 (Hirsch).  While the Court has explained that the inquiry whether a defendant may properly challenge a particular search or seizure under the Fourth Amendment is more properly "classified as a substantive Fourth Amendment test, as opposed to a standing test," see Ortiz v. New Mexico, 550 F. Supp. 3d 1020, 1112 (D.N.M. 2021)(Browning, J.), it remains true that "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable," Minnesota v. Carter, 525 U.S. 83, 88 (1998).  To challenge an automobile search, a defendant carries "the burden of proving he lawfully possessed the vehicle in order to show that he had a reasonable expectation of privacy in the vehicle." United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000).  The Tenth Circuit has "held the following criteria 'important[] though not determinative': '(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle.'" United States v. Parada, 577 F.3d 1275, 1280 (10th Cir. 2009)(quoting United States v. Allen, 235 F.3d at 489).

In its Findings of Fact, supra, ¶ 40, at 10, the Court finds, based on evidence offered at the suppression hearing, including testimony demonstrating that the vehicle was Quintana-Pena's and evidence demonstrating that Quintana-Pena had "personal belongings" in the vehicle, that Quintana-Pena lawfully possessed the vehicle.  The Court concludes, therefore, that he had a reasonable expectation of privacy in the vehicle.  See United States v. Parada, 577 F.3d at 1280.  Accordingly, because Quintana-Pena had a legitimate expectation of privacy in the vehicle at the time the search occurred, he may seek suppression of the evidence discovered therein.

United States v. Elmore, 101 F.4th 1210, 1216 (10th Cir. 2024)(quoting Riley v. California, 573 U.S. 373, 381-82 (2014).  See United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  Here, it is undisputed that officers did not obtain a warrant before searching the vehicle Quintana-Pena occupied.  See FOF ¶ 39, at 9.  Nonetheless, there are "a number of exceptions" to the warrant requirement."  United States v. Elmore, 101 F.4th at 1216 (quoting Birchfield v. North Dakota, 579 U.S. 438, 456 (2016)).  "The government . . . bears the burden of proving that its warrantless actions were justified [by an exception]."  United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994).

Here, Quintana-Pena argues that the officers did not have reasonable suspicion to initiate contact with him, see MTS at 10-11, nor probable cause to search the vehicle, see MTS at 11-13. The United States responds that officers were lawfully present on the street when they observed in plain view the heroin on Quintana-Pena's lap, and thus the officers' initial contact with Quintana-Pena was justified.  See Response at 6.  Next, the United States contends that the search of Quintana-Pena's vehicle was justified under the automobile exception and as a search incident to arrest.  See Response 6-8.  The Court first analyzes the officers' initial encounter with Quintana-Pena, and agrees with the United States that, because the officers did not conduct a search or seizure when the approached the vehicle and observed the heroin in plain view on Quintana-Pena's lap, their actions did not violate the Fourth Amendment.  Next, the Court assesses the Constitutionality of the officers' warrantless search of Quintana-Pena's vehicle and concludes that the search was justified by the automobile exception and as an automobile search incident to Quintana-Pena's lawful arrest.  Accordingly, the Court concludes that the search of Quintana-Pena's vehicle did not violate Quintana-Pena's Fourth Amendment rights and, therefore, Quintana-Pena is not entitled to suppression of the evidence discovered during the search.

A.   **THE OFFICERS DID NOT VIOLATE THE FOURTH AMENDMENT BY APPROACHING QUINTANA-PENA'S VEHICLE AND INITIATING CONTACT WITH HIM.**

Quintana-Pena argues that the officers violated his Fourth Amendment rights when they first approached his vehicle and initiated contact with him.  Specifically, he contends that "the officers did not have reasonable suspicion to initiate contact with him," because the officers had no reason "to suspect legal wrongdoing."  MTS at 10.  The United States responds that Broyles was "present on a public road . . . and used a flashlight to illuminate" the vehicle's interior, and that "[n]either of these actions infringed on any of Defendant's Constitutional rights."  Response at 6.  A law enforcement officer's conduct only violates the Fourth Amendment if his or her actions constitute an impermissible search or seizure.  See United States v. Jacobsen, 466 U.S. 109,  113 (1984)(explaining that the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures'").  "A police officer may seize someone either by physical force or a show of authority."  United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017).  "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'"  United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)(quoting California v. Hodari D., 499 U.S. 621, 625-26 (1991)).  Regarding searches, the Fourth Amendment is implicated when a defendant shows both "'a subjective expectation of privacy in the object of the challenged [intrusion],' and that 'society [is] willing to recognize that expectation as reasonable.'" United States v. Neugin, 958 F.3d 924, 930 (10th Cir. 2020)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

Here, Quintana-Pena was not seized when officers approached his vehicle, because Quintana-Pena did not submit to a show of authority.  Although the Tenth Circuit has assumed

without deciding that an officer's "initial conduct" of "shining bright lights" on a defendant's vehicle and "walking toward the car" constitutes a show of authority, United States v. Roberson, 864 F.3d at 1124, a show of authority alone is not a seizure "without actual submission," Brendlin v. California, 551 U.S. 249, 254 (2007). "Actual submission depends on 'the view of a reasonable law enforcement officer" under "the totality of the circumstances," [and] "requires, at minimum, that a suspect manifest compliance with police orders," United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Salazar, 609 F.3d at 1064-65, and then United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)). Here, when Broyles approached Quintana-Pena's vehicle, Quintana-Pena did not initially acknowledge Broyles, and when he did, he turned around and threw the black box into the backseat. See FOF ¶¶ 18-32, 4-7. Under the totality of the circumstances, a reasonable law enforcement officer would not view Quintana-Pena as submitting until he placed his arms in the air and exited the vehicle in response to Broyles request that he do so. See FOF ¶¶ 32-34, at 7. See United States v. Roberson, 864 F.3d at 1126 ("A reasonable officer would not have thought Mr. Roberson submitted until he stopped his stuffing motions and complied with the officers' orders by showing his hands on the steering wheel . . . ."); United States v. Salazar, 609 F.3d at 1061-61 ("When Mr. Salazar's pickup started to go around Trooper Berner's patrol car, Trooper Berner stepped out of his car, drew his firearm, and yelled at Mr. Salazar to stop and get out of the pickup. At that point, Mr. Salazar complied."); United States v. Johnson, 212 F.3d 1313, 1316-17 (D.C. Cir. 2000)("Before Johnson raised his hands, [the officer] had made a show of authority but Johnson had not submitted to it. On the contrary, he continued to make 'shoving down' motions, gestures that were the very opposite of complying with [the officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun."). Moreover, this conclusion finds support in the fact that the Tenth Circuit has held that

there is no seizure when an officer merely approaches a person seated in a vehicle to check on the individual and ask a few questions, because such interactions constitute consensual encounters. United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012)(concluding that a defendant was not seized "the moment Officer Balderrama approached his car," because, "[a]s part of a consensual encounter, an officer may approach an individual, ask a few questions, ask to examine the individual's identification, and even ask for consent to search").  Accord United States v. Kim, 25 F.3d 1426, 1430 (9th Cir. 1994)("[W]here . . . officers come upon an already parked car, th[e] disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense ab initio, except of his own volition.").  In sum, Quintana-Pena was not seized when the officers first approached his vehicle and only became seized when he complied with Broyles orders and raised his hands.

Broyles' approach of Quintana-Pena's car and shining a light through his window also did not constitute a search.  The Supreme Court has made clear that a law enforcement officer does not intrude on a vehicle occupant's Fourth Amendment rights when he or she uses a "flashlight to illuminate the interior of [a] car," as Broyles did here.  Texas v. Brown, 460 U.S. at 739-40 ("[T]he use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.").  Consistent with this precedent, Broyles actions did not constitute a search, because "there is no legitimate expectation of privacy in a car's interior if an officer looks through the car's window and observes contraband in plain view." United States v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993).  See Texas v. Brown, 460 U.S. at 740 (reasoning that there is "no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers").

At bottom, even if approaching Quintana-Pena's vehicle and looking into his window constituted a search or seizure, Broyles' initial actions were justified by the community caretaking exception.  One exception to the warrant requirement "is a search or seizure conducted pursuant to police officers' 'community caretaking functions.'"  United States v. Venezia, 995 F.3d 1170, 1175 (10th Cir. 2021).  The community caretaker principle allows law enforcement officers to "effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'"  Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007)(quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993)).  Broyles was called to the scene in response to a 911 caller who advised that Quintana-Pena was nodding in and out of consciousness.  See FOF ¶ 1, at 2.  Broyles was therefore justified in approaching Quintana-Pena's vehicle, because he was acting in his community caretaking capacity to ensure that Quintana-Pena did not require medical assistance.  See Novitsky v. City of Aurora, 491 F.3d at 1253-54 ("Because the officers encountered Mr. Novitsky lying in the fetal position in the back of a parked car in response to a 'man down' call, we conclude these actions were a reasonable exercise of their community caretaking functions."); United States v. Purvis, 663 F. Supp. 3d 1233, 1249-50 (D.N.M. 2023)(Urias, J.)(concluding that, because the officers' "focus was clearly on making contact with Mr. Purvis to determine if the situation required their intervention or assistance, . . . [t]he officers' conduct with Mr. Purvis was reasonable to assure the safety of the public as well as the safety of Mr. Purvis himself" pursuant to the community caretaking exception).  Accordingly, when Broyles approached Quintana-Pena's vehicle and peered inside, the governmental interest in keeping Quintana-Pena and the public safe outweighed Quintana-Pena's interest in being free from government interference.  See United States v. King, 990 F.2d

at 1560.  For these reasons, Broyles did not violate Quintana-Pena's Fourth Amendment rights when he approached the vehicle and shined a flashlight through the driver's side window, because his actions did not constitute a search or seizure and, even if they did, Broyles actions were justified.

**B.    THE WARRANTLESS SEARCH OF QUINTANA-PENA'S VEHICLE WAS JUSTIFIED.**

Quintana-Pena argues that the officers search of his vehicle violated his Fourth Amendment rights, and, accordingly, requests that the Court suppress the evidence discovered in the vehicle.  See MTS at 3, 13.  As discussed previously, evidence obtained as a result of a warrantless search need not be suppressed if the United States can demonstrate that the failure to obtain a warrant was excused by an exception.  See United States v. Neugin, 958 F.3d at 930.  The United States argues that two such exceptions justify the vehicle search: the automobile exception and the search-incident-to-arrest exception.  Response at 6-8.  The Court agrees with the United States and concludes that, because the officers established probable cause that the vehicle contained evidence of criminal activity when they observed the heroin on Quintana-Pena's lap, the subsequent search was justified as an automobile search and a vehicle search incident to Quintana-Pena's lawful arrest.  Accordingly, the search did not violate Quintana-Pena's Constitutional rights and he is not entitled to suppression of the evidence discovered in the vehicle.

**1.    The Officers Who Searched Quintana-Pena's Vehicle Had Probable Cause that the Vehicle Contained Evidence of Criminal Activity When They Began the Search.**

The Court concludes that each officer involved in the search of Quintana-Pena's vehicle had probable cause that the vehicle contained evidence of illegal activity when they initiated the search, because they observed what they knew to be heroin in plain view on Quintana-Pena's lap

before initiating the search.  As he stood next to Quintana-Pena's vehicle and looked through the

driver's side window, Broyles observed what he knew to be heroin on Quintana-Pena's lap.  See

FOF ¶ 5, at 4.  Through his words and gestures, he alerted Lujan and Haught, who arrived at the

vehicle shortly after Broyles, of the heroin, and both Lujan and Haught observed the heroin.  See

FOF ¶¶ 7-8, 30-31, at 5, 8.  Accordingly, each officer involved in the search of Quintana-Pena's

vehicle observed what they knew to be heroin before Quintana-Pena awoke, the officers removed

Quintana-Pena from the car, see FOF ¶¶ 9-11, at 5, and Haught initiated a search of the vehicle,

see FOF ¶ 34, at 9.  "If an officer is lawfully positioned in a place from which an object can be

plainly viewed, the officer is permitted to notice whatever is put on display and the observation of

the article is generally not considered a search," United States v. Gordon, 741 F.3d 64, 71 (10th

Cir. 2014), and such "information obtained as a result of observation of an object in plain sight

may be the basis for probable cause or reasonable suspicion of illegal activity," Texas v. Brown,

460 U.S. at 739 n.4.  See Horton v. California, 496 U.S. 128, 140 (1990)("If an article is already

in plain view, neither its observation nor its seizure would involve any invasion of privacy.").  The

Court concludes in Section I.A., supra, at 69-73, that the officers were lawfully positioned when

they observed what they knew from their training and experience to be heroin, because they did

not effectuate a search or seizure in reaching that position.  See Kentucky v. King, 563 U.S. at

462-63 (holding that law enforcement may seize evidence in plain view "provided that they have

not violated the Fourth Amendment in arriving at the spot from which the observation of the

evidence is made").  Accordingly, the officers had probable cause that the vehicle contained

evidence of criminal activity when they observed the heroin.  See United States v. Mercado, 307

F.3d 1226, 1230 (10th Cir. 2002)(concluding that, because an officer "was at liberty to look in the

windows of the van and make observations," the officer's observations could establish probable cause that the van contained contraband).

**2.    The Automobile Exception Justifies the Search of Quintana-Pena's Vehicle.**

Because the officers had probable cause that Quintana-Pena's vehicle contained evidence of illegal activity, the automobile exception justified their search of Quintana-Pena's vehicle. The automobile exception to the warrant requirement allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. See Collins v. Virginia, 584 U.S. at 591-92; United States v. Mercado, 307 F.3d at 1228 ("When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband."). "Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband." United States v. Bradford, 423 F.3d 1149, 1160 (10th Cir. 2005)(citing United States v. Ross, 456 U.S. 798, 825 (1982)).

Here, having observed the heroin in the box on Quintana-Pena's lap, the officers each had probable cause to believe the vehicle contained heroin. For that reason, they could "search the car without first obtaining a search warrant." United States v. Beckstead, 500 F.3d 1154, 1165 (10th Cir. 2007). In addition, armed with probable cause that the vehicle contained narcotics, the officers were empowered to search containers within the vehicle, including the black box, the bag located in the vehicle's back seat, and the vehicle's center console, because these containers reasonably may have contained drugs. See United States v. Bradford, 423 F.3d at 1160. In addition, Quintana-Pena's argument that the officers should not have proceeded with the search after Salazar informed

them that Quintana-Pena was a friend and that she wished to invite him inside, see MTS at 9, 13, is unavailing, because Broyles had already established probable cause through his observation of the heroin, the presence of which he subsequently alerted Lujan and Haught to, before Salazar approached him, see FOF ¶¶ 5-6, at 4.  Moreover, under the collective knowledge doctrine, the reasonable suspicion or probable cause of one officer can be imputed to another officer.  See United States v. Pickel, 863 F.3d 1240, 1249 (10th Cir. 2017)("Under the collective knowledge doctrine, the officer who makes a stop or conducts a search need not have reasonable suspicion or probable cause. Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer.").  Thus, even if Broyles hadn't expressly communicated his probable cause to the other officers by alerting them to the heroin, "each officer on scene would have been permitted to conduct . . . a warrantless search based on probable cause."  United States v. Vallez, No. CR 23-0749, 2024 WL 1886575, at *7 (D.N.M. April 30, 2024)(Johnson, C.J.).  In sum, because the officers had probable cause to believe Quintana-Pena's vehicle contained evidence of criminal activity, they were justified in searching the vehicle and all containers therein that might contain contraband without first obtaining a warrant.  Texas v. Brown, 460 U.S. at 739 ("[R]equiring police to obtain a warrant once they have obtained a first-hand perception of contraband . . . or incriminating evidence generally would be a 'needless inconvenience.'" (quoting Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971))).

### 3.    The Search-Incident-to-Arrest Exception Justifies the Search of Quintana-Pena's Vehicle.

The United States argues that the search of Quintana-Pena's vehicle was separately justified as a search incident to arrest.  See Response at 7-8.  A search incident to a lawful arrest is a well-established exception to the Fourth Amendment's warrant requirement that allows an

officer to search "the arrestee's person and the area 'within his immediate control,'" defined as "the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, 395 U.S. at 763.  Where law enforcement officers lawfully place a recent vehicle occupant under arrest, they may search the vehicle based on the "arresting officer's reasonable belief that the vehicle contains evidence of the crime precipitating the arrest."  United States v. Knapp, 917 F.3d at 1168.  See United States v. Gant, 556 U.S. at 343.  Here, because Quintana-Pena was under arrest based on probable cause that he was in possession of illegal narcotics at the time the vehicle search began, the officers were justified in searching his vehicle.

An arrest is a highly intrusive or lengthy seizure that is only reasonable if supported by probable cause.  See United States v. Hammond, 890 F.3d at 904.  "'[T]he use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest.'"  United States v. White, 584 F.3d 935, 952 (10th Cir. 2009)(quoting Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007)).  Here, the actions the officers took to initially detain Quintana-Pena and remove him from the vehicle were "intrusive" enough to constitute an arrest.  Cortez v. McCauley, 478 F.3d at 1115.  Multiple officers drew their firearms and pointed them at Quintana-Pena, grabbed his arms and pulled him out of the vehicle, forcibly placed him in handcuffs, and moved him to the front of the vehicle.  See FOF ¶¶ 10-13, 32-33, at 5-6, 8-9; Morris v. Noe, 672 F.3d 1185, 1192 (10th Cir. 2012)(concluding that officers' use of force and handcuffing individual constituted a full custodial arrest).  While the Tenth Circuit has held that the use of handcuffs during an investigative detention does not, as a rule, transform the seizure into a formal arrest when used to "maintain the status quo during the course of [the detention]," United States v. Neff, 300 F.3d 1217, 1220-21 (10th Cir. 2002), the officers significantly altered the status quo by removing Quintana-Pena from his vehicle and walking him to the front of the

automobile, see Morris v. Noe, 672 F.3d at 1192 ("Defendant Noe did not merely 'maintain the status quo' when he took Morris to the ground." (no citation given for quoted material)).  Under the totality of the circumstances, the officers' "use of firearms, handcuffs, and other forceful techniques," rendered their seizure of Quintana-Pena an arrest, at the moment he was handcuffed and moved to the front of his vehicle.  Cortez v. McCauley, 478 F.3d at 1116.  See Plascencia v. Taylor, 514 F. App'x 711, 716 (10th Cir. 2013)(concluding that an arrest occurred when officers "immediately handcuffed" the individual, "applied several forceful techniques" on the individual, and "forcefully moved" the individual to a different location).

Because the officers had probable cause that a crime was being committed in their presence when they observed the heroin on Quintana-Pena's lap, their arrest of Quintana-Pena shortly thereafter was lawful and did not impinge on Quintana-Pena's Fourth Amendment rights.  District of Columbia v. Wesby, 583 U.S. 48, 56 (2018)("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence.").  As the Supreme Court explains, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Arizona v. Gant, 556 U.S. at 343 (quoting Thornton v. United States, 541 U.S. 615, 632 (2004)(Scalia, J., concurring)).  Here, it was reasonable for the officers, each of whom observed a large quantity of heroin on Quintana-Pena's lap, to believe that the vehicle might contain evidence relevant to the drug possession crime the officers had reasonable suspicion Quintana-Pena had committed.  Cf. United States v. Madden, 682 F.3d at 926 ("[I]t was not reasonable to believe his vehicle contained evidence of the offense of arrest, i.e., evidence of two outstanding municipal misdemeanor traffic warrants.").  Accordingly, the offense of Quintana-Pena's arrest, namely possession of narcotics, "suppl[ied] a basis for searching the passenger

Case 1:20-cr-01627-JB   Document 105   Filed 08/30/24   Page 79 of 84

compartment of [Quintana-Pena's] vehicle and any containers therein." Arizona v. Gant, 556 U.S. at 344. See United States v. Aranda-Diaz, No. CR 12-2686, 2013 WL 4446801, at *31 (D.N.M. July 15, 2013)(Browning, J.)("With probable cause to believe that the Suburban contained evidence relevant to the heroin distribution crime, United States v. Ross and Arizona v. Gant provided the officers the lawful ability to search any area of the vehicle in which evidence relevant to the crime might be found."), aff'd, 623 F. App'x 912 (10th Cir. 2015); United States v. Vallez, No. CR 23-0749, 2024 WL 1886575, at *6 (D.N.M. Apr. 30, 2024)(Johnson, C.J.)("[O]nce law enforcement has made a 'lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest' search the vehicle.").  In sum, because the officers had probable cause of illegal activity when they lawfully observed the heroin in plain view on Quintana-Pena's lap, the officers' search of Quintana-Pena's vehicle was separately justified by the automobile exception to the warrant requirement and as a search incident to Quintana-Pena's lawful arrest.

## II.   THE COURT WILL SUPPRESS QUINTANA-PENA'S STATEMENTS TO BROYLES UNDER MIRANDA BUT WILL NOT SUPPRESS THE PHYSICAL EVIDENCE DISCOVERED DURING THE SEARCH ON THE BASIS OF THE MIRANDA VIOLATION.

Quintana-Pena briefly argues that he was "questioned without Miranda warnings," MTS at 2, and, accordingly, his statements to the officers must be suppressed, see MTS at 14.  The Court agrees with Quintana-Pena that Broyles violated his Fifth Amendment rights by failing to provide Quintana-Pena with a Miranda warning before interrogating him in custody, and, accordingly, the Court will suppress the statements Quintana-Pena made to officers.[13]   The Fifth Amendment

---

[13]The United States argues that Quintana-Pena's motion to suppress his statements is moot, because the United States avers that it will not seek to introduce the statements in its case in chief. See Response at 8.  While the Tenth Circuit has suggested that district courts may deny as moot a

"prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." United States v. Cook, 599 F.3d 1208, 1213 (10th Cir. 2010)(quoting Miranda, 384 U.S. at 444). Law enforcement must advise a suspect of their Miranda rights only "at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008)(quoting United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008)). "Courts typically conduct this analysis in two steps, addressing (1) whether the questioning constituted an interrogation, and (2) whether the suspect was in custody for Miranda purposes." United States v. Wagner, 951 F.3d 1232, 1250 (10th Cir. 2020),

Here, Broyles' questioning of Quintana-Pena constituted an interrogation and Quintana-Pena was in custody when the questioning took place. "[T]he term 'interrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). See United States v. Sanchez, 13 F.4th 1063, 1074-75 (10th Cir. 2021). Broyles directly asked Quintana-Pena multiple times what was in the black box the officers observed on Quintana-Pena's lap. See FOF ¶¶ 13-18, at 6; Broyles Lapel Video at 03:45-03:53 ("What the fuck is that

_____

motion to suppress statements that the United States affirms it will not use at trial, see United States v. Cota-Herrera, 75 F. App'x 695, 699 (10th Cir. 2003)("In denying Cota-Herrera's motions to suppress, the district court concluded that the claim was moot as the government did not seek to introduce into evidence any of Cota-Herrera's statements taken before he was informed of his Miranda rights."), Quintana-Pena argues that the evidence discovered in his vehicle must be suppressed on the basis of the alleged Miranda violation, see MTS at 1. Accordingly, the Court declines to deny the motion as moot and will analyze the alleged failure to provide Miranda warnings to determine whether any of the physical evidence should be suppressed on the basis of a Miranda violation. See United States v. Cota-Herrera, 75 F. App'x at 699 (Affirming the district court's denial as moot of the defendant's motion to suppress where there was "no indication that evidence admitted at trial was derived from Cota-Herrera's statements taken before he was informed of his Miranda rights under the fruit-of-the-poisonous-tree doctrine").

black thing that's in that container?").  In addition, once Quintana-Pena admitted there were drugs in the black box, Broyles asked what kind of drugs they were and whether Quintana-Pena was selling the drugs.  See FOF ¶¶ 19-22, at 6-7.  Because Broyles "should have known" that his direct questions "were reasonably likely to elicit an incriminating statement," his questioning of Quintana-Pena constituted an interrogation.  United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013).

Furthermore, Quintana-Pena was in custody at the time of the questioning.  "An interrogation is custodial when, 'in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'"  United States v. Wagner, 951 F.3d at 1250 (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)).  Four non-exclusive factors inform the custody analysis: (i) the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview; (ii) the nature of the questioning; (iii) the extent to which law enforcement officers dominate the encounter; and (iv) whether officers release the suspect following the questioning.  United States v. Wagner, 951 F.3d at 1250 (citing United States v. Jones, 523 F.3d at 1240; Howes v. Fields, 565 U.S. at 509).  Here, neither Broyles nor any other officer told Quintana-Pena he was free to leave, and the nature of Broyles' questioning was forcible.  See FOF ¶¶ 13-22, 6-7.  Cf. United States v. Chee, 514 F.3d at 1114 (concluding that an interrogation was not custodial where officers informed the defendant "that he was not under arrest and was free to leave at the beginning of the interrogation" and the officers' "tone remained calm and conversational throughout the interrogation").  In addition, multiple law enforcement officers, who had drawn their weapons on Quintana-Pena, dragged him from his vehicle, and handcuffed him immediately prior to the interrogation and Quintana-Pena was not released following the interaction.  Cf. United States v.

Wagner, 951 F.3d at 1251 (concluding that an interrogation was non-custodial where the record contained no evidence that "the agents displayed their weapons or made physical contact" and "the agents left Mr. Wagner's residence without making an arrest"). Finally, the Court has concluded that Quintana-Pena was under arrest at the time Broyles interrogated him, see Section I.B.3., supra, at 77-78, and the Tenth Circuit has advised that a defendant is "in custody" for Miranda purposes when his or her "freedom of action is curtailed to a 'degree associated with formal arrest.'" United States v. Jones, 523 F.3d at 1239 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). Accordingly, the Court suppresses the statements Quintana-Pena made to the officers on the night of his arrest. See United States v. Cook, 599 F.3d at 1213.

While the Court suppresses the statements themselves, the Court will not suppress any of the evidence that the officers discovered during the search on the grounds that Quintana-Pena's Miranda rights were violated. At the time of Broyles' interrogation, the officers had already observed what they knew from their experience and training to be heroin and, thus, had probable cause to search the vehicle. Because Quintana-Pena's statements did not lead to the discovery of the physical evidence in any way, Quintana-Pena cannot "demonstrate a causal link between the violation and the contraband." United States v. DeLuca, 269 F.3d 1128, 1134 (10th Cir. 2001). Moreover, even if there was some causal connection between Quintana-Pena's statements and the discovery of the physical evidence, the officers' "independent investigation inevitably would have led to discovery of the evidence . . . ." United States v. Larsen, 127 F.3d 984, 986 (10th Cir. 1997)("Evidence found as a result of illegal police conduct that inevitably would have been lawfully discovered absent the illegal conduct need not be suppressed."). The officers had already observed the heroin and were in the process of conducting a lawful search of Quintana-Pena's vehicle at the time of the questioning. See FOF ¶¶ 35-36, at 8; United States v. Larsen, 127 F.3d

at 987 ("The fact that another investigation was already underway when a constitutional violation occurred is strong proof that it was independent of the illegal investigation."); United States v. Reyes, 202 F. Supp. 3d 1209, 1216 (D. Kan. 2016)(Melgren, J.)("Even if Officer Henry had never elicited an incriminating statement from Reyes, the canine unit would have arrived on scene.").

Finally, "physical evidence that is the fruit of a voluntary statement should not be suppressed even if the statement was elicited without a Miranda warning." United States v. Phillips, 468 F.3d 1264 (10th Cir. 2006). See United States v. Patane, 542 U.S. 630, 634 (2004)(plurality opinion)("[T]he Self-Incrimination Clause . . . is not implicated by the introduction at trial of physical evidence resulting from voluntary statements . . . ."). The Court concludes that, while Quintana-Pena's statements were not preceded by a Miranda warning, they were voluntary, because Quintana-Pena's will was not overborne by the totality of the circumstances surrounding his statements and his statements were freely made, as Broyles did not promise Quintana-Pena anything and made no threats of physical force during the interrogation. See United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993)(concluding that a defendant's statements were voluntary where there "were no threats or physical abuse of any kind" and "the record does not show how Muniz's intoxicated state rendered him unable to voluntarily speak"); United States v. Gonzales, No. 21-2099, 2022 WL 17725388, *6 (10th Cir. December 16, 2022), cert. denied, 144 S. Ct. 114 (2023)(concluding that "the drugs and firearm recovered during the stop" need not be suppressed because "derivative physical fruits of unwarned but otherwise voluntary  statements are admissible"). In sum, the Court will suppress the statements Quintana-Pena made to Broyles, but the Court will not suppress any of the physical evidence during the search.

**IT IS ORDERED** that: (i) the Defendant's Motion to Suppress Evidence Based on Constitutional Violations, filed March 22, 2024 (Doc. 84), is granted in part and denied in part; (ii) the physical evidence discovered during the search is admissible; and (iii) the statements Quintana-Pena made to Officer Jerome Broyles are suppressed.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Alex M. M. Uballez
  United States Attorney
David B. Hirsch
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Brian A. Pori
Albuquerque, New Mexico

     *Attorneys for the Defendant*